```
1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
2                        LOUISVILLE DIVISION

3
     UNITED STATES OF AMERICA,    )     Case No. 3:15-MJ-00555-CHL
4                                 )
             Plaintiff,           )
5                                 )
         VS.                      )
6                                 )
     KEVIN DIETZ,                 )
7                                 )     December 18, 2015
             Defendant.           )     Louisville, Kentucky
8

9                            *  *  *  *  *

10        TRANSCRIPT OF PRELIMINARY AND DETENTION HEARINGS
                   BEFORE HONORABLE DAVE WHALIN
11               UNITED STATES MAGISTRATE JUDGE

12                           *  *  *  *  *

13

     APPEARANCES:
14
     For United States:       Jo E. Lawless
15                            U. S. Attorney's Office
                              717 West Broadway
16                            Louisville, KY 40202

17   For Defendant:           Patrick J. Renn
                              Smith & Helman
18                            600 West Main Street, Suite 100
                              Louisville, KY 40202
19

20   Transcriber:             Dena Legg, RDR, CRR, CCR-KY
                              Official Court Reporter
21                            232 U. S. Courthouse
                              Louisville, KY 40202
22

23

         Proceedings recorded by digital recording.  Transcript
24   produced by computer from audio recording that the Court
     provided to transcriber.
25
```

Rankhorn - Direct

1          (Begin proceedings in open court.)

2              DEPUTY CLERK:  3:15-MJ-555, *United States of America*

3    *v. Kevin Dietz.*  We're here for preliminary and detention

4    hearings.

5              MS. LAWLESS:  Good afternoon, Your Honor.  Jo Lawless

6    on behalf of the United States.

7              THE COURT:  Ms. Lawless.

8              MR. RENN:  Your Honor, good afternoon.  Pat Renn with

9    Kevin Dietz and he is seated here to my left at counsel table.

10             THE COURT:  All right.  Do you wish a preliminary

11   hearing, Mr. Renn?

12             MR. RENN:  Your Honor, very briefly, I have seen the

13   criminal complaint in this case and understand that the affiant

14   is not here, hoped she was going to be here but she's not, but

15   just as soon have the United States go ahead and put on its

16   witness.

17             THE COURT:  All right.

18             MS. LAWLESS:  Your Honor, the United States calls

19   Special Agent Amanda Rankhorn.

20             DEPUTY CLERK:  Raise your right hand.

21      (SPECIAL AGENT AMANDA J. RANKHORN, called by the Government,

22   sworn.)

23                        DIRECT EXAMINATION

24   BY MS. LAWLESS:

25   Q.  Would you state your name for the record and spell your last

Rankhorn - Direct

1    name, please.

2    A.  My name is Amanda J. Rankhorn.  Last name is spelled

3    R-A-N-K-H-O-R-N.

4    Q.  By whom are you employed?

5    A.  The Federal Bureau of Investigation.

6    Q.  And what is your position with the FBI?

7    A.  Special agent/forensic examiner.

8    Q.  How long have you been a special agent?

9    A.  Approximately 17 years.

10   Q.  And how long have you been a forensic examiner?

11   A.  Since 2003, so 12 years.

12   Q.  Okay.  Special Agent Rankhorn, are you -- were you involved

13   in execution of the search warrant at Mr. Dietz's residence at

14   Fort Knox earlier this week?

15   A.  Yes, I was.

16   Q.  All right.  And have you had an opportunity to review the

17   affidavit that was prepared and signed by your colleague,

18   Special Agent Virginia MacHenry, in support of the criminal

19   complaint?

20   A.  Yes.

21   Q.  All right.  Are you aware of any changes that need to be

22   made to that affidavit, anything needs to be added or taken

23   away?

24   A.  No, ma'am, there was nothing in there that -- there was

25   nothing in here that I saw that disagreed with my experiences

```
 1   onsite.
 2            MS. LAWLESS:  Okay.  We'll stand on that, Your Honor.
 3            THE COURT:  All right.  Mr. Renn, please.
 4            MR. RENN:  Thank you, Your Honor.
 5                         CROSS-EXAMINATION
 6   BY MR. RENN:
 7   Q.  It's Rankhorn; is that correct?
 8   A.  Yes, sir.
 9   Q.  Okay.  And I understand from your direct examination that
10   you did participate in the execution of the search warrant; is
11   that correct?
12   A.  Yes, I did.
13   Q.  And the complaint that was filed in this case was by
14   Virginia MacHenry, not you; is that correct?
15   A.  That's correct.
16   Q.  And there was a search warrant affidavit that was applied
17   for; is that correct?
18   A.  Yes, that's correct.
19   Q.  And that was a federal affidavit and search warrant?
20   A.  Yes, yes, sir.
21   Q.  Were you the affiant on the --
22   A.  No, sir.
23   Q.  Do you have any 302s or do you have any writings yourself
24   concerning the investigation here or the --
25   A.  No, sir.
```

Rankhorn - Cross

1    Q.   No writings whatsoever?

2    A.   No, sir, only handwritten notes for the examination we did

3    on scene and on-site preview.

4    Q.   That brings me -- you do have handwritten notes; correct?

5    A.   Not with me, no, no, sir.

6    Q.   Where are those?

7    A.   Those are at our lab.

8    Q.   Well, obviously, you knew we were having the hearing today;

9    correct?

10   A.   Yes, sir.

11   Q.   And did the assistant United States attorney ask you to

12   bring any writings that you would have knowing that I would be

13   entitled to those?

14   A.   No, sir, I wouldn't have expected that we would have brought

15   them in only because it was for very specific information, such

16   as just what time we interacted with the computer, what time we

17   shut it down.  There's no specifics regarding the pictures that

18   were encountered.

19   Q.   So do you think it's up to you to decide what's important

20   and what's not important?

21        THE COURT:  Well, Mr. Renn, she's offered her reasons

22   for it not being here so...

23        MR. RENN:  Well, Your Honor, I would ask for those

24   statements.  Under 26.2, I'm clearly entitled to them.  This is

25   a statement of a witness concerning the investigation in this

Rankhorn - Cross

1    case.  Whether she think it's important or not, that's what the

2    rules say, that I'm entitled to those.

3              THE COURT:  Ms. Lawless.

4              MS. LAWLESS:  Your Honor, we have never turned over

5    just notes of when somebody goes in or not.  I apologize.  It

6    certainly is not something to divert.

7        I've been fully open with Mr. Renn.  In fact, before

8    Mr. Renn even made an appearance in this case, I sent him a copy

9    of the affidavit and discussed with him the background and what

10   had gone on in the case.  So we've made our best effort.  If we

11   fall short, I apologize, but I don't think that there's been a

12   violation of the rules, certainly not on intentional one, and

13   she's happy to answer any questions about what happened that

14   day.  The affidavit certainly contains the information that led

15   to the execution of the search warrant, and I think she has some

16   working knowledge about what was going on that day.

17             THE COURT:  All right.  Well, Mr. Renn, we can take

18   this up later, if you want, or we can continue the hearing until

19   the notes are produced.  And if there's an issue, I can look at

20   them and determine what you're entitled to and what you're not.

21   It's up to you.

22             MR. RENN:  Obviously, my man's in custody so I feel

23   like I have to go forward, but the whole reason you would have

24   the statement -- yeah, she can testify to facts, but there may

25   be something in those notes to contradict that I would be able

Rankhorn - Cross

1    to use to impeach her with.  But, obviously, I can't do that

2    here today because we don't have the notes.

3            THE COURT:  Well, again, it's your choice.  Do you

4    want to go forward or not?

5            MR. RENN:  I guess is the court then inclined to

6    release Mr. Dietz?  Pretrial services has filed a report in this

7    case.  Obviously, we recognize it's a presumption case.  We can

8    go through the factors and why those presumptions should not

9    apply in this case or at least be overcome, and then there's

10   recommendations from the probation office recommending that

11   Mr. Dietz be released and released on a number of conditions,

12   including electronic monitoring.

13           THE COURT:  I think the first thing that has to be

14   done is put the Government to the test of establishing probable

15   cause --

16           MR. RENN:  Probable cause.

17           THE COURT:  -- before we get to the issue of detention

18   so I can't tell you whether I would be inclined to release him

19   or not.

20           MR. RENN:  Well, then I'm asking the court to strike

21   this witness's testimony, which is required under the rules, and

22   that's exactly what happened here.

23           MS. LAWLESS:  Your Honor, how about if we take a brief

24   recess and we'll have her notes brought over?

25           THE COURT:  Okay.  Let's do that.  All right,

1    Mr. Renn?

2            MR. RENN:  Yes, sir.

3        (At this point, after a recess, the hearing resumed.)

4            THE COURT:  All right.

5            DEPUTY CLERK:  Back on the record for 3:15-MJ-555,

6    *United States of America v. Kevin Dietz.*

7            THE COURT:  Let's see.  Agent, take the stand again,

8    please, and this is Special Agent Rankhorn for the FBI.

9            MR. RENN:  Thank you.

10           THE COURT:  Still under oath, ma'am.

11           THE WITNESS:  Yes, sir.

12                          CROSS-EXAMINATION

13   BY MR. RENN (CONTINUING):

14   Q.  Agent Rankhorn, again, you did participate in the execution

15   of the federal search warrant at Mr. Dietz's home; correct?

16   A.  Yes, sir.

17   Q.  And you did have some notes and we have seen those notes

18   here this afternoon; correct?

19   A.  Yes, sir.

20   Q.  What time was it that the search warrant was -- well, strike

21   that.  What day was the search warrant executed?

22   A.  On December 16th.

23   Q.  Okay.  And the search warrant was actually applied for on

24   December the 8th; is that correct?

25   A.  I don't recall.

Rankhorn - Cross

1          MR. RENN:  May I approach the witness, Your Honor?

2          THE COURT:  Yes.

3          MS. LAWLESS:  She would -- that's fine, but she

4    wouldn't know anything about that.

5          MR. RENN:  That's fine.

6    BY MR. RENN:

7    Q.  Can you identify what this document is?

8    A.  It's a search and seizure warrant.

9    Q.  And who is the -- what is the property to be searched?

10   A.  5717 Brown Avenue, Apartment A, Fort Knox, Kentucky.

11   Q.  Is that the location [inaudible] search warrant described as

12   Mr. Dietz's home; is that correct?

13   A.  Yes.

14   Q.  What's the date and the time that that search warrant was

15   signed?

16   A.  It was signed December 8th at 2:30 p.m.

17   Q.  Okay.  And you-all waited some eight days before you went

18   and executed the search warrant; correct?

19   A.  Yes, sir.

20   Q.  Okay.  And I say you-all executed the search warrant.

21   Obviously, you're with the FBI.  Were there other FBI agents

22   present?

23   A.  Yes, sir.

24   Q.  How many agents were there?

25   A.  Approximately ten total agents.

Rankhorn - Cross

1    Q.   Okay.  And in addition to the FBI, were there any other law

2    enforcement agents there or officers?

3    A.   Army CID and the approximately ten people includes both Army

4    CID and FBI.

5    Q.   Okay.  And the Army CID, again, you described the location

6    at Fort Knox; correct?

7    A.   That's correct.

8    Q.   And you're aware that Mr. Dietz is in the United States

9    Army; is that correct?

10   A.   Yes, sir.

11   Q.   Okay.  And what time was it that you-all executed this

12   search warrant on December the 16th?

13   A.   We arrived at approximately 8:40 a.m., but we didn't

14   actually enter the location for some time.

15   Q.   And why is that?

16   A.   There was nobody home and we didn't have a way into the

17   building.

18   Q.   Okay.  And you-all did make contact with Mr. Dietz; is that

19   correct?

20   A.   Yes, we did.

21   Q.   And was that before you went into the house or after?

22   A.   My understanding, it was after we -- it was -- I don't know

23   if it was before or after we entered the house.  I know that we

24   had tried to enter the home, were not able to.  A key was

25   obtained and at some point after that I was told that Mr. Dietz

Rankhorn - Cross

1    had been contacted and that he was on his way.

2    Q.  So you obtained a key from someone other than Mr. Dietz;

3    correct?

4    A.  I don't know exactly who it came from.  I just know that the

5    key was brought there.

6    Q.  Okay.  And when you got there, you being a forensic person,

7    you went and secured the computer; is that correct?

8    A.  Yes, sir.  There were multiple computers, but that was my

9    focus.

10   Q.  Okay.  Were any other agents trained to do forensic exams?

11   A.  We -- the other -- the only other personnel that were with

12   me to deal with computer evidence were three trainees so they're

13   actually in the process of being trained.  That's part of the

14   reason that they were there.

15   Q.  Being trained by you?

16   A.  That's correct.

17   Q.  And would it be your testimony that you and those three

18   trainees secured those computers and other apparatuses, whether

19   it's a phone, tablets or even -- I think there was a PlayStation

20   perhaps?

21   A.  Correct.  In some cases we were the ones that were the first

22   people to have access to them and in other cases other searching

23   agents would bring us items to either determine whether or not

24   they actually have any memory in them or if we could -- if they

25   needed to be previewed but to at least make us aware of their

Rankhorn - Cross

1    existence.

2    Q.  But would it be fair to say that no other officer turned on

3    those devices other than you and perhaps these trainees?

4    A.  The only thing I know of was a Kindle being handed to me

5    that was already on.  I would assume that nobody would be doing

6    anything with them.  I have no information that anybody accessed

7    anything -- any of the digital evidence there.

8    Q.  And if they had, that would be against protocol.  Would that

9    be fair to say?

10   A.  Our best practices are that if you would have an examiner on

11   scene, you would want to utilize them, and that's what I was

12   witnessing as far as the behavior of the other agents.

13   Q.  Okay.  And were the devices all photographed in place prior

14   to being turned over to you?  Do you know?

15   A.   In some cases there were items that were photographed before

16   they were brought to us, but I know that we started -- I know

17   that the one computer that we interacted with that was on --

18   there was a picture taken of the entire room so it would have

19   been captured in place, but there was no close-up of it before

20   we started handling it.

21   Q.  Okay.  And on one of the devices, according to your notes, a

22   hard drive HD was removed; is that correct?

23   A.  That's correct.

24   Q.  And that was after -- was there any testing done there, any

25   exam, preliminary exam done at the home?

Rankhorn - Cross

1    A.   I'm sorry.  Yes, there was -- well, there was a preview that

2    was done --

3    Q.   Okay.

4    A.   -- where we took the hard drive, connected it to a write

5    blocker and then connected it to a laptop and then ran a piece

6    of software to preview the contents of the hard drive.

7    Q.   Okay.  And then at some point, according to the complaint,

8    Mr. Dietz came to his home; is that correct?

9    A.   Yes, sir.

10   Q.   And one of the officers actually called him; is that

11   correct?

12   A.   That's my understanding, sir.

13   Q.   And he was asked to come to his home?

14   A.   I don't know what exactly was said.  I just know that -- I

15   know that in the affidavit -- no, he was asked to return to his

16   residence.

17   Q.   And he did that; correct?

18   A.   He did, yes, sir.

19   Q.   Voluntarily?

20   A.   As -- yes, sir, as far as I know.

21   Q.   Okay.  And when he arrived there at the home, do you know if

22   he was placed in handcuffs?

23   A.   I never saw any handcuffs, sir.

24   Q.   Okay.  So he came voluntarily.  He stayed there at the

25   house; correct?

Rankhorn - Cross

1    A.   Yes, sir.

2    Q.   And he was not formally under arrest; correct?

3    A.   No, sir.

4    Q.   And according to the complaint, at some point he was

5    provided his Constitutional rights; correct?

6    A.   I'd have to refer back to the affidavit because I wasn't --

7    I wasn't there at the time.  Yes, sir, it is in the affidavit.

8    Q.   Okay.  Do you know if he was given those orally or if he was

9    given those in writing?

10   A.   I don't know, sir.

11   Q.   Okay.  So you don't know if he signed anything; correct?

12   A.   No, sir.

13   Q.   And according to the complaint, again, he was interviewed;

14   is that correct?

15   A.   Yes.

16   Q.   Do you know if that was recorded any way, digitally or

17   audio?

18   A.   I don't know, sir.

19   Q.   Okay.  Do you know if it's pursuant to the FBI policy now

20   that they would record these interviews or not?

21   A.   The -- and you'll have to forgive because in my position, we

22   don't do interviews.  I haven't done them.  But my understanding

23   was that custodial interviews there's a requirement for

24   recording, but I don't know about this particular circumstance,

25   if that would fall within our policy or not.

1    Q.   Okay.  Was Mr. Dietz ultimately formally arrested?

2    A.   Yes, sir.

3    Q.   And that was done there at his home; correct?

4    A.   I believe so.  I actually departed the scene before that

5    occurred.

6    Q.   Okay.  While Mr. Dietz was there, was he compliant with all

7    the officers and any requests that were made of him?

8    A.   As far as I know, yes, sir.

9              MR. RENN:  Okay.  Nothing further, Your Honor.

10             THE COURT:  All right.

11             MS. LAWLESS:  No questions.

12             THE COURT:  All right.  You may step down.  Thank you.

13             THE WITNESS:  Thank you, sir.

14             THE COURT:  Any other witnesses?

15             MS. LAWLESS:  No, sir.

16             THE COURT:  All right.  I'll hear from you,

17   Ms. Lawless, as to probable cause.

18             MS. LAWLESS:  Your Honor, we'll stand on the

19   affidavit.  I think that the information that is set out in the

20   affidavit clearly establishes probable cause to support the

21   arrest on the charges that are listed.

22             THE COURT:  Mr. Renn.

23             MR. RENN:  Your Honor, I would ask the court not to

24   make a finding of probable cause.

25             THE COURT:  All right.  I think that the affidavit is

```
 1    sufficient to establish probable cause.  I can go through the
 2    information but --
 3              MR. RENN:  Your Honor, I don't believe that's
 4    necessary.
 5              THE COURT:  All right.  So when will this matter be
 6    presented to the grand jury?
 7              MS. LAWLESS:  Also the beginning of January, Your
 8    Honor.
 9              THE COURT:  All right.  And arraignment date, if
10    there's an indictment.
11              DEPUTY CLERK:  January 28th at 9:30.
12              THE COURT:  Okay.  All right.  Mr. Renn, this is a
13    presumption case, sir.  I'll hear from you first.
14              MR. RENN:  Did you say the 28th, on a --
15              DEPUTY CLERK:  Yes.
16              THE COURT:  The Government has moved for detention;
17    right?
18              MS. LAWLESS:  That's correct, Your Honor.  This is a
19    presumption case.
20              THE COURT:  Yes.
21              MR. RENN:  Your Honor, obviously, we were aware that
22    the Government was going to be asking for detention in this case
23    and further aware that this would be a presumption case based on
24    the allegations in the complaint.  And, again, a presumption is
25    just that.  It's a presumption that can be overcome and there's
```

1    reasons, you know, of course, under the statute why the court

2    would make such a finding or the United States earlier saying,

3    well, you don't even get to the factors if there's not some

4    reason to get over those particular -- that particular

5    presumption, but certainly those factors come into play and to

6    show whether this is somebody --

7              THE COURT:  Ultimately they do, yes.

8              MR. RENN:  -- yes, who can be compliant.  And looking

9    at the first factor, obviously, is the nature and circumstances

10   of the offense, and that statute talks about a case involving a

11   minor.  Now, clearly, the child pornography statute comes under

12   that Chapter 110, but this isn't a case where there was any

13   touching of any child, any threat to a child, any threatened use

14   of a child.  This is viewing materials on a computer screen, and

15   the computer screen apparently in this case was in the privacy

16   of a home, not somewhere else.

17       The next factor would be the weight of the evidence against

18   the individual.  And it's important to note that while the

19   complaint does have allegations in here and statements that

20   Mr. Dietz may have made to the officers on the day that they

21   came in there, this is to be the least important and the least

22   significant factor out of all the other factors for the court to

23   consider and a lot of reasons for that.

24       As the statute says, there's nothing to take away the

25   presumption of innocence.  Otherwise, simply by somebody having

1   probable cause to believe that a crime was committed, that would

2   be reason to go ahead and start punishing them and taking away

3   their liberty and, obviously, that's not the intent here.

4       The other factors would be here a person's personal

5   character.  Obviously, the presentence report that's been filed

6   in here speaks for itself on all these particular issues, and I

7   think these all weigh strongly in favor of conditions supporting

8   rebutting that presumption.  And that is, again, the personal

9   character of this individual, his physical and mental

10  conditions.  The reason that there was initially an assessment

11  here for nonappearance, an assessment of danger, there's

12  allegations here about mental health history.  There's no

13  question he does have some mental health issues, but as he says

14  in here, he's had those for some time.

15      He's been able to work.  He's been able to perform his job

16  well, and that is in the United States Army.  And he does have a

17  doctor but he had not seen the doctor for some six months.  And

18  then more importantly, he does take medicines, and those

19  medicines are able to help him to get through and do the things

20  that he needs to do at his job, with his family and other

21  things.

22      His family ties.  We were in front of Judge Lindsay

23  yesterday and at that time and it's noted in the presentence

24  report that his mother and father, John and Mary Dietz --

25  they're from up in Dayton, Ohio -- both were down here

1    yesterday.  They're not here today because they did take

2    Mr. Dietz and his wife's children -- they have two children, as

3    noted in the presentence report, a son eight and a daughter six.

4    They took those children from the home.  They've taken them back

5    to Dayton where they reside and where Mr. Dietz was born and --

6    well, not born but was raised, along with his wife, who was also

7    raised in that area there in Ohio.  So the kids are out of the

8    house but Mr. and Ms. Dietz certainly would be here if they

9    didn't have the kids.

10       Tiffany Dietz is here and that is Kevin Dietz's wife.  She's

11   present.  She was here yesterday.  Obviously, again, strong

12   family ties.

13       His employment is noted in the presentence report.  He's

14   been in the United States Army now for ten years.  He spent a

15   little over six years at Fort Benning, Georgia, and has been

16   here at Fort Knox now for three-and-a-half years.  Again, has

17   done well at his job.  He is a sergeant, I think an E-5, in the

18   United States Army.

19       Financial resources.  He does have a good monthly income and

20   that's noted in the presentence report.  Expenses here of being

21   -- showing 1,451, total income of $3,800, so he does have a good

22   cash flow.

23       Legal residence in the community.  He's not from the

24   Louisville community, but they have been now at Fort Knox and

25   have established themselves there for three-and-a-half-years,

1    where the kids were in school, his wife lives, and where he of

2    course worked.

3        Community ties.  He would have those community ties not only

4    here but also those very significant community ties up in the

5    Dayton, Ohio area, where he was born.

6        Past conduct.  He's had no criminal offense and that would

7    be the -- one of the factors here, his criminal history.  No

8    criminal history whatsoever.  A 36-year-old man with no

9    violations.  Again, in the United States Army.  He has not had

10   any conduct violations of any note whatsoever.  And he also

11   spent time over in Iraq and, again, served his country well

12   while he was there.

13       History of drug and alcohol abuse.  There's been no drug

14   abuse whatsoever.  He has not had alcohol for some 12 years so

15   that is certainly not an issue and would go in his favor.

16       And then the record of court appearance, again, he's not

17   been to court.  He hasn't had any criminal history so that would

18   certainly weigh in his favor as well.

19       Subsection (b) of that is whether he was on probation and

20   parole, any pending sentencing, pending court appearances, and

21   of course, the answer is no there as well.

22       Finally, number four, if there was any danger, then you

23   would look at the nature of that dangerousness and the

24   seriousness of the danger.

25       The allegations, again, go back -- specific allegations to

1   some references on a computer back in February 2015.  Here a

2   search warrant was signed back on December the 8th and was not

3   executed for some eight days.

4       If he was such a danger to the community and is such a

5   danger here today, it would have been something that you would

6   think that the Government, as soon as they got that search

7   warrant signed, they would have gotten agents out there.  They

8   would have executed it right away but, again, there was an

9   eight-day delay in doing that.  And, again, the danger here and

10  the seriousness of the danger isn't as to physical harm to

11  anyone whatsoever.  It's viewing material on a computer screen.

12      Looking at those factors and the history that he's had here,

13  I think, does rebut that presumption and then the court can look

14  at the least restrictive -- and that's the most important thing

15  here -- the least restrictive condition or combination of

16  conditions that's going to objectively and reasonably show

17  whether it's likely that he's going to come back to court as

18  required or whether he would be a danger to any person.  And

19  then the statute sets out specifically a whole host of things

20  that the court can do, up to and including the most restrictive

21  of all those, and that would be electronic monitoring.

22      Pretrial did have an opportunity after yesterday -- the

23  recommendation was going to be that he -- that Mr. Dietz be

24  detained, but this morning my understanding is that Mr. Hack

25  from the probation office was able to go out, meet with

1    Ms. Tiffany Dietz and also meet with Staff Sergeant Anderson,

2    who is here in the courtroom, and he would not be -- the

3    recommendation would not allow Mr. Dietz to go back in the home.

4        Again, his children are out of the home right now, but in

5    all likelihood, after the Christmas break, that they would be

6    going back to the home.  But, again, Sergeant Anderson can't

7    take -- can't, I guess, be the third party custodian, nor can

8    the United States Army be the third party custodian for him, but

9    I did speak with the company commander and Mr. Anderson had me

10   to speak with this woman.

11       Basically, what they would be doing and what they -- if the

12   court would permit it is they would pick him up at the jail, in

13   this case here Grayson County, take Mr. Dietz back on barracks

14   and that's where he would be staying.  He would not be staying

15   in the home.  He would have a personal room there in the

16   barracks.  He would not have access to any computer, would not

17   have access to any internet while he was there at the room.

18       He's not going to be able to do his job.  And I did ask the

19   company commander if they would be able to be like a designated

20   person and she said, "Well, we can't do that.  We can't give 24-

21   hour protection."

22       I said, "We're not asking for that.  Would you be willing,

23   if ordered, that he would remain there on the base and the

24   barracks, and if he didn't follow that order, would you-all be

25   willing to called CID?  Would you be willing to call the FBI?

1   Would you be willing to call probation?"  And she said, "Yes, we

2   can do that."

3        Obviously, we've got Sergeant Anderson in here and he can

4   confirm that that is something that they would be able to do.

5   Again, not give 24-hour a day protection and security but

6   certainly if all of a sudden we find that Mr. Dietz is on a

7   computer or if we find Mr. Dietz isn't where he's supposed to

8   be, they would then be able to call and take that additional

9   responsibility.

10       So there are a number of conditions and combinations of

11  conditions that could be imposed.  The probation office is

12  recommending a $25,000 unsecured bond.  And then going through

13  these factors, number three being the home detention with GPS,

14  and number four, that he reside in the Army barracks -- and,

15  again, all those things can be complied with -- I believe that

16  does rebut the presumption.

17       And, again, we're looking at the most restrictive condition

18  that he's not going to be going back to his home, that he's

19  going to be going on barracks, that he would be on home

20  detention, and those are more than enough to reasonably --

21  again, we're not guaranteeing that he's not going to come back

22  to court.  We're not guaranteeing that he won't be a danger, but

23  what we're saying is it's reasonably likely to anticipate that

24  somebody who's 36 years old, doesn't have a passport, doesn't

25  have any family, doesn't have any friends outside either Fort

1   Knox or outside of Dayton, Ohio, that he is a reasonably going

2   to come back to court and that he's not going to be a danger to

3   anyone whatsoever.

4       And so for those reasons, Your Honor, we would ask the court

5   to follow the recommendations of the pretrial report and to

6   release Mr. Dietz based on those conditions.

7           THE COURT:  Ms. Lawless.

8           MS. LAWLESS:  Your Honor, I know that you evaluate

9   every case on its merits, but I'm not going to repeat all the

10  arguments I made to you earlier today.  I know you're familiar

11  with the limitations -- the great work from pretrial services

12  but the limitations that are placed on them as well.

13      We are not asking for detention with regard to Mr. Dietz as

14  a risk of nonappearance.  I don't think that there's anything in

15  his history that demonstrates that he's not likely to appear.

16      However, we do disagree with defense that he is a danger to

17  the community.  I would concede to the court that they've

18  overcome the presumption but disagree with the defense that the

19  factors -- once you get over that hurdle of rebutting the

20  presumption, that the factors, when you look at all of them with

21  regard to the specifics of this defendant and this case, weigh

22  in favor of release.  I don't think that that's true.  I think

23  that they weigh in favor of detention.

24      Going back through them, not to belabor the point because

25  Mr. Renn has already identified them to the court, but we

certainly have a different view on how they apply in the case.
The nature and circumstances of the offense and whether it
involves a minor victim, that weighs clearly in favor of
detention in this particular case because it falls into the
subset of categories that Congress has asked the courts to look
at more closely with regard to detention or release.

The weight of the evidence against the person doesn't have
to do with innocence or guilt.  As I noted earlier, he enjoys a
presumption of innocence.  We respect that.  We understand what
our burden is, but it's kind of hard, especially in child
exploitation cases, to separate them because the evidence of the
crime deals directly with dangerousness and the weight of it
goes directly to the danger and harm to the community, not just
the local community but the community more at large.

I think that what is important to look at in this case, Your
Honor, and why it is different than the one that you heard a
little bit earlier, the charges are different.  While both of
these men were involved in the same online community, if you
will, through website "A," in talking to other like-minded
individuals, in addition to looking for just maybe typing in a
search term, getting access to -- not that I am minimizing that.
You know I don't -- looking at it and keeping it, which would be
a receipt and a possession, Mr. Dietz is different because he is
also charged with advertising, and that is in the same criminal
statute that covers production of child pornography.  That's how

1   Congress -- they put them together.

2        I'm not saying that he was actually taking photographs of

3   children or making his own new child pornography, but in the

4   umbrella of that particular statutory provision, there is also a

5   crime for advertising.

6        And in this particular case and how it applies to these

7   facts and why it's important with regard to dangerousness is

8   that he's involved in that online community with like-minded

9   people.  He is specifically putting out there -- and we laid out

10  for the court in numbered paragraph six -- on February 20th of

11  2015, he made a post entitled "looking for this video" to the

12  thread titled "Request."

13       And among other things, the post stated that he had been

14  looking for a video of a blonde girl sucking on a purple rabbit

15  style vib, heard there is more to it besides the sucking.  Found

16  a few gifts but nothing else.

17       Another person recognizes what he's talking about and sends

18  him then a link, to which Mr. Dietz responds, "Thank you."  He's

19  looking for specific videos of a little girl being sexually

20  abused.  He gets the link to that and then responds to that

21  person, "Thank you."

22       I am not jumping ahead but it's kind of hard -- you know, we

23  can try the case, absolutely, but thinking about from a

24  dangerousness perspective, I would be remiss if I didn't mention

25  that the Sentencing Commission later on down has told courts,

one of the things that you need to be concerned about and how we differentiate between offenders with regard to child sexual exploitation is whether they're involved with groups, online, and what their relationship and interaction is.

And in this particular case, Mr. Dietz is very actively involved looking for specific things, getting those things and having that exchange back and forth, which perpetuates the production and distribution, obviously, of child pornography.

Mr. Dietz, again on February 22nd of this year, accessed a post on "Website A" in the "Kinky Fetish - Bondage" section and was looking for a hyperlink that involved some other things that include prepubescent female being anally and vaginally penetrated.  These are things that he's specifically looking for and communicating with other individuals about.  That is a step up, Your Honor.  That is advertisement specifically asking for what he wants in order to receive it.

So we believe that certainly with regard to Mr. Dietz and his conduct, the weight of the evidence against him with regard to dangerousness is higher.  That risk of dangerousness is higher.

When we look at the history and characteristics of the person, clearly Mr. Dietz has things that very much go into the positive column.  He has served his country in the armed services.  Apparently he has done well.  He has a wife, family. He supports them.  He meets his financial obligations, and he

stands before the court really different than a lot of people that come before the court.

However, when he was interviewed just a couple of days ago after being advised of his Constitutional rights, he admitted that there were going to be additional photos on the desktop and his phone.  This was after they had already discovered thousands of still and video images on a laptop, a PlayStation gaming system, an external hard drive, and a Kindle.

He admitted to them that he -- that what they were going to find was maybe only about half of what he had actually acquired and collected because he had deleted a good number of them to try and hide his activity from his wife.

In addition to admitting that he had looked at, downloaded, and stored child pornography, he told the agents that he was addicted to pornography claiming that it had started when he was seven years old.  This is a very long-standing issue and problem that has not been addressed, and it has escalated clearly to the point where he really knows what he likes.  He knows what he's looking for, and he is not afraid to ask other people to help him find exactly what he wants.

When they looked at the preview of those thousands of videos and still images that were discovered -- and that's just with a preview.  We haven't even really gotten into the depths of the hard drives from the various devices -- they primarily dealt with children between the ages of 10 and 12, with many focusing

on the children's genitals and masturbation.  So active sexual

abuse.  We're not talking about -- because you and I know

there's a continuum of what is clearly criminal child

pornography but there's a range of posing all the way through

rape and things of that nature.

These images, these videos, the things he was looking for

involve true sexual activity with children.  So although he has

good things definitely in his history and characteristics, there

are other things that are quite troubling.  By his own

admission, that addiction going back to age seven.  Taking steps

to hide his criminal behavior from his wife and from others,

which makes it very difficult, I think, then to really be able

to monitor and supervise someone to the level that you can even

reasonably assure the safety of the community.  This is

something he has wanted and been interested in and sought out

for a very, very long time.

The fourth factor there at the end, the nature and

seriousness of the danger to any person or the community posed

by his release, I think, brings all of it together.  I would

acknowledge that in Mr. Dietz's situation, being in an Army

barracks is certainly more safe than being in a residential area

where there are other children around.  It's certainly more safe

than being back in his home where his children would be around

as well, but you can't -- we've talked about this before.  You

can't keep all computer devices away from people.  Even Army

1    barracks have -- people have phones.  People have gaming

2    systems.  There are ways to get access to it, and while he has

3    certainly brought before the court some pretty significant

4    things for you to consider, we would urge the court, in light of

5    all of this, to determine that on whole when you look at the

6    factors that there isn't any way to reasonably assure the safety

7    of the community by his release, and we would ask for you to

8    detain him.

9              THE COURT:  Mr. Renn.

10             MR. RENN:  Your Honor, I understand that they're

11   making this claim about an advertising charge, but in my view,

12   if you're asking for a specific post -- again, he's not asking,

13   go out and produce this.  He's asking for something that

14   apparently he had previously seen, a post entitled "looking for

15   this video" and then says what it is.  So it's something -- not

16   asking somebody to go out and produce this.  It's already been

17   produced.

18       I can't see that being any different than somebody who is

19   engaged in child pornography distribution, and that's what

20   happens in all these cases.  I'll trade you mine if you trade me

21   yours.  There's no difference whatsoever.  It's not like, you

22   know, you're asking somebody to go out there and produce a

23   specific kind of child pornography.  So I don't think this case

24   is any different, these allegations are any different than any

25   other garden variety child pornography case that comes before

1   the court and certainly not a production case as was discussed

2   here.

3       Dangerousness goes to --

4           THE COURT:  It is different given the number of images

5   and some of the activity.  There are also other differences

6   though, and maybe we need to hear from Sergeant Anderson as

7   exactly what the Army would provide.  I mean, I've heard

8   different things, but I need to know particularly what they

9   could do.

10          MR. RENN:  Well, I think it's important also, again,

11  just for the record here, again, dangerousness must be there's a

12  strong probability that the person's going to go and engage in

13  criminal activity again.  It isn't that you can detain somebody

14  for dangerousness based on past dangerousness.  It's what

15  they're going to predict as far as future behavior.

16          THE COURT:  But, again, in a case such as this,

17  Mr. Renn, the problem being someone with a really strong

18  addiction is going to be seeking out ways to obtain child

19  pornography.  And, again, that's why I need to hear from

20  Sergeant Anderson as to just exactly what the Army is willing to

21  do.

22          MR. RENN:  Again, the addiction that was talked about

23  here at age seven was pornography, not child pornography.

24          THE COURT:  Well, I know, but we've heard -- we've

25  heard proffered by the Government and set forth in the affidavit

1    certainly more recent activity which is particular to child

2    pornography.

3         MR. RENN:  Well, I agree.  But, again, to say that

4    he's been doing something -- you can look at pornography all day

5    long and there's no --

6         THE COURT:  I understand that.

7         MR. RENN:  -- there's no problem whatsoever.

8         THE COURT:  Listen, I understand all that.  I just

9    want to know what the Army can do to keep him away from

10   computers.  That's all I need to know right now.

11        MR. RENN:  Okay.  Sergeant Anderson.

12        THE COURT:  Raise your right hand.

13      (SERGEANT BYRON ALVIN ANDERSON, called by the defense,

14   sworn.)

15        THE COURT:  All right.  Have a seat there, sir,

16   please.

17                    DIRECT EXAMINATION

18   BY MR. RENN:

19   Q.  Sergeant Anderson, good afternoon.

20   A.  Good afternoon.

21   Q.  If you would, tell Judge Whalin your full name, please.

22   A.  Byron Alvin Anderson.

23   Q.  And, Sergeant Anderson, you are in the United States Army;

24   is that correct?

25   A.  Yes, I am.

Anderson - Direct

1    Q.   And how long have you been in the United States Army?

2    A.   It's been a little over 19 years.

3    Q.   Okay.  And you and I met yesterday; is that correct?

4    A.   Yes, sir.

5    Q.   And we met here at the courthouse; correct?

6    A.   Yes, sir.

7    Q.   I didn't ask you to be here, did I?

8    A.   No, sir.

9    Q.   Who was it that asked you to come here to court?

10   A.   Any time a soldier goes to court, we normally will come to

11   see what the outcomes are.

12   Q.   Okay.  And we did have to -- we did have an opportunity to

13   have a discussion about what the Army may be able to do or what

14   they may want to do in this case with Mr. Dietz; is that

15   correct?

16   A.   Yes, sir.

17   Q.   And Mr. Dietz, he also is in the United States Army;

18   correct?

19   A.   Yes, sir.

20   Q.   And he is a sergeant?

21   A.   Yes.

22   Q.   Okay.  And you also met with a couple of these ladies from

23   the probation office; is that correct?

24   A.   Yes.

25   Q.   And this morning did you have an opportunity to meet with

Anderson - Direct

1   another individual from the probation office out at Mr. Dietz's

2   home?

3   A.   Yes, I did.

4   Q.   And his wife Tiffany was also present; is that correct?

5   A.   Yes.

6   Q.   And was that Mr. Hack who was from the probation office?

7   A.   Yes.

8   Q.   And prior to meeting with Mr. Hack and Ms. Dietz, had you

9   had an opportunity to discuss this situation with the company

10  commander?

11  A.   Yes.

12  Q.   And who is the company commander again?

13  A.   Stern, Captain Stern.

14  Q.   Okay.  And you and I, before coming before the court today,

15  we had a conversation with Company Commander Captain Stern; is

16  that correct?

17  A.   Yes.

18  Q.   And if you would, tell the court what Captain Stern -- what

19  you know about what would happen if Mr. Dietz gets released by

20  the court.

21       THE COURT:  Let me ask first, Sergeant Anderson, where

22  do you play in all of this?  I mean, what is your assignment at

23  Fort Knox?  Why are you the one who would be involved in this?

24       THE WITNESS:  I am Sergeant Dietz's supervisor.  He

25  works over at behavioral health.

1          THE COURT:  I see.

2          THE WITNESS:  Yes, sir.

3          THE COURT:  All right.  So in the chain of command,

4    you would be the --

5          THE WITNESS:  I'm his fist line supervisor.

6          THE COURT:  Okay.  Thank you.  Go ahead.

7    BY MR. RENN:

8    Q.  And, again, you have had conversations with the company

9    commander yourself about Mr. Dietz and what would happen if the

10   court was to release him; correct?

11   A.  Yes, sir.

12   Q.  And what is your understanding of what the Army would be

13   able to do and willing to do for Sergeant Dietz?

14   A.  My understanding is that the Army would allow him to stay in

15   the barracks.  It wouldn't be 24-hour supervision and we would

16   be able to keep the computers away.  He would not have access to

17   a computer.

18          THE COURT:  Is this a barracks where other soldiers

19   are living?

20          THE WITNESS:  Yes, sir.  He would have his own room.

21          THE COURT:  But other soldiers there would have access

22   to the internet and -- by various devices and there's internet

23   there in the barracks?

24          THE WITNESS:  The soldiers, you know, if they pay for

25   the internet, the soldiers would have access to it.

```
 1              THE COURT:  In each of the rooms they have to pay

 2    something to have internet?

 3              THE WITNESS:  Yes, sir.

 4              THE COURT:  Okay.  But there are devices there, I'm

 5    assuming.  How many soldiers live in the barracks?

 6              THE WITNESS:  Sir, I'm not sure the exact amount.

 7              THE COURT:  Can you estimate for me, please.

 8              THE WITNESS:  I would say those barracks probably

 9    could hold two, 300 soldiers.

10              THE COURT:  Okay.  And they're all young soldiers.

11    They've got more devices than you can count, I'm assuming,

12    smartphones, tablets.

13              THE WITNESS:  Yes, sir.

14              THE COURT:  Laptops; right?

15              THE WITNESS:  Yes, sir.

16              THE COURT:  Is there wireless internet there in the

17    barracks?

18              THE WITNESS:  I'm pretty sure there's not because the

19    soldiers have to pay for it, you know, individually.  And I'm --

20    I'm not 100 percent on this, but I think it would have to be

21    Time Warner, which there's hardware to the barracks so it would

22    have a jumper.  You know, the soldiers would have to have a

23    jumper.

24              THE COURT:  Is there internet and access in any common

25    areas there?
```

Anderson - Direct

```
1              THE WITNESS:  I'm not sure.  I'm not sure of that,
2    sir.
3              THE COURT:  Okay.  Go ahead, Mr. Renn.
4    BY MR. RENN:
5    Q.  And, again, when we were talking out here, my idea of a
6    barracks goes back to Gomer Pyle and they had everybody in a big
7    open area.  That's not the case anymore, is it?
8    A.  No, sir.  He would have his own separate room.
9    Q.  Okay.  And, again, in talking with Captain Sterns, if the
10   court ordered that he remain there in the barracks, again, there
11   wouldn't be any 24/7 supervision, but if he happened to violate
12   that condition or if he violated the condition that he had
13   access to either the internet or a computer, she would be
14   willing or somebody there at the Army would be willing to notify
15   the probation office or CID?  Would that be correct?
16   A.  Yes.
17   Q.  And that's what she's told you they would be able to do?
18   A.  Yes.
19   Q.  Okay.  And told me as well.
20   A.  Yes, sir.
21   Q.  And you heard her telling me that?
22   A.  Yes.
23              MR. RENN:  Okay.
24              THE COURT:  He works in a mental health unit; is that
25   right?
```

1          THE WITNESS:  Yes, sir.

2          THE COURT:  If he were released, would he go back to

3    work there?

4          THE WITNESS:  No, sir.

5          THE COURT:  Where would he go?

6          THE WITNESS:  The company would have to determine.

7    Normally in different cases that soldiers -- you know, if

8    they're in trouble or something like that, they would remove

9    them to another area, but that's determined by the command, sir.

10   BY MR. RENN:

11   Q.  And the reason that Captain Stern said he would not go back

12   to his present job is there would be children there; correct?

13   A.  Yes.

14   Q.  And she said he would not be allowed to go back to that job

15   or any place where there would be children?

16   A.  Yes, sir.

17          THE COURT:  Excuse me.  All right.  Go ahead,

18   Mr. Renn.

19          MR. RENN:  Your Honor, I don't have any further

20   questions.

21          THE COURT:  All right.  Ms. Lawless.

22          MS. LAWLESS:  Your Honor, you asked the questions,

23   honestly, that I had.  I don't have any questions.

24          THE COURT:  That's fine.

25     Thank you.  You may step down.  Thank you, sir, and thank

1    you for your service.

2             THE WITNESS:  Thank you, sir.

3             THE COURT:  Mr. Renn.

4             MR. RENN:  And, again, prior to, you know, the court

5    asking to hear from Sergeant Anderson, again, looking at a

6    strong probability, not past dangerousness, not past crimes.

7    It's what we can look to in the future.  And here if the crime

8    is we want to make sure that he's not on the internet, again,

9    there's ways to do that and that's what this sergeant has

10   testified.  That being that Sergeant Dietz would be in a room.

11   He would not have access to a computer.  And, obviously, anybody

12   that's out, not just Sergeant Dietz, but anybody that if the

13   court said you can't have access to these particular devices,

14   you can certainly find a way to have access to them.

15       But what's his reasonable behavior going to be?  What's

16   reasonably going to assure that he's going to come back to court

17   as required?  That's what the court has to find.  Is he a risk

18   of flight?  The United States said that's not an issue but

19   certainly one that the court wants to look at, and then what

20   reasonable behavior can we anticipate in the dangerous -- to any

21   person or to the community?

22       No allegations of any kind of threat or physical harm to any

23   person, no physical threats or anything like that to the

24   community at large.  Obviously, we all know, you know, what goes

25   on in these child pornography cases and what's gone on in the

1    past, but we're looking at what we can do as far as not ensure

2    and guarantee but reasonably and objectively what can we

3    anticipate his conduct to be.

4        And based on all those factors, mom and dad -- his dad's a

5    career military guy, retired from the Air Force.  That's why

6    they're living up in Dayton.  He's right off the Air Force base,

7    raised this sergeant.  He's raised his daughter.  They grew up

8    there.  Good educations, good work history.  No prior record

9    whatsoever.

10       You know, we're not talking about somebody going out

11   fighting, somebody getting in DUIs, somebody doing any behavior.

12   We're not talking about an 18- or 19-year-old kid.  We're

13   talking about a 36-year-old man who's been a good employee, good

14   husband, good father, other than these allegations.

15       And, again, looking at what we can predict, not would

16   guarantee but reasonable probability, we can certainly assume

17   that he is going to come back to court as required and, also,

18   that he's not going to present a danger to any person or the

19   community.  And you can impose all these conditions, including

20   the most restrictive of GPS, to make sure he's going to comply

21   with those.

22              THE COURT:  All right.

23              MS. LAWLESS:  Very briefly, Your Honor.  I believe

24   that Sergeant Anderson gave you the best information that he has

25   available, but there are causes for concern.  With two to 300

1    soldiers in barracks, not everybody is locked down on the

2    internet.  We have prosecuted soldiers for accessing child

3    pornography from barracks at Fort Campbell and other places.

4        It is impossible to be sure that even with a reasonable

5    probability that he will not have access to devices that have

6    capability to access the internet when he is living under --

7    while he may have his own room, under the roof with two to 300

8    other young people, who as the court noted, often have more

9    devices than we can even count.

10       That coupled with the long-standing interest that he has,

11   and while there are lots of things in his personal history that

12   weigh in favor of him and bode well for him -- and one thing

13   that we really have not talked about and I think I was remiss in

14   it is that even in the pretrial services report he admitted to

15   having thoughts of suicide several times a week.

16       This is somebody who struggles with these kinds of issues,

17   with addiction, with thoughts of suicide, and he's been able to

18   sort of manage those things while still being a productive

19   member of society and within the military, but when you're

20   looking at facing these serious kinds of charges with this

21   long-standing interest and struggles with thoughts of suicide,

22   living now with two to 300 other people, all of whom are going

23   to have these devices, Your Honor, there isn't any way to

24   reasonably assure the safety of the larger community from

25   further criminal conduct that involves online accessing, seeking

1    out, and acquiring child pornography, and we would ask the court

2    respectfully to detain Mr. Dietz.

3             THE COURT:  All right.  Anything else, Mr. Renn?

4             MR. RENN:  Nothing further, Your Honor.

5             THE COURT:  All right.  I'll take it under advisement

6    and I'll get you a decision here soon.

7        In the meantime, I'm going to order that Mr. Dietz be

8    detained.  I'll remand him to the custody of the marshal's

9    service.  All right?  Thank you.

10        (End of transcript.)

11

12                    **C E R T I F I C A T E**

13        I am an official court reporter for the U.S. District Court

14   for the Western District of Kentucky and certify that the

15   foregoing is a true and correct transcript, to the best of my

16   ability, of the above pages, of the stenographic notes provided

17   to me by the Court of the proceedings taken on the date and time

18   previously stated in the above matter.  In preparing this

19   transcript, I have also relied upon audio tapes of the

20   proceedings provided by the Court.

21

22        _____          _____
          s/ Dena Legg                  February 3, 2015
          Official Court Reporter       Date

23

24

25

1                                        INDEX

2        GOVERNMENT WITNESS:

3        SPECIAL AGENT AMANDA J. RANKHORN
               Direct Examination by Ms. Lawless            2
4              Cross-Examination by Mr. Renn                4
               Cross-Examination by Mr. Renn (Continuing)   8
5
         DEFENSE WITNESS:
6        SERGEANT BYRON ALVIN ANDERSON
               Direct Examination by Mr. Renn              32
7

8                                      EXHIBITS
9
         GOVERNMENT:
10       No Exhibits

11

         DEFENDANT:
12       No Exhibits

13

14

15

16

17

18

19

20

21

22

23

24

25